☑ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br>The Cellular Telephone Assigned Call Number (414) 813-3693 (Target Cell Phone 9) | ) | Case No. 24-867M(NJ)<br>Matter No. 2023R00283 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the ________ District of ________ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 7/1/2024 *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Honorable Nancy Joseph.
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for ____ days *(not to exceed 30)* ☑ until, the facts justifying, the later specific date of 12/11/2024.

Date and time issued: 6/17/2024 @ 2:17 p.m.

Nancy Joseph
*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

*Executing officer's signature*

*Printed name and title*

## ATTACHMENT A-2

**Property to Be Searched**

1. Records and information associated with the cellular device assigned the call number (414) 813-3693 (Target Cell Phone 9). Target Cell Phone 9 is in the custody or control of AT&T Corporation (referred to herein and in Attachment B as the "Service Provider" or "Provider") a wireless telephone service provider headquartered at 11760 U.S. Highway 1, North Palm Beach, Florida.

2. Target Cell Phone 9.

## ATTACHMENT B

### Particular Things to be Seized

### I. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phones for the time period March 1, 2023, to the present:

   i. Names (including subscriber names, usernames, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long-distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber

Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phones for the time period March 1, 2023, to the present including:

a. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

b. Information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

b. Information associated with each communication to and from the Target Cell Phones for a period of **30** days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e., antenna towers covering specific geographic areas) and sectors (i.e., faces of the towers) to which the Target Cell Phones will connect at the beginning and end of each

communication, as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

c. Information about the location of the Target Cell Phones for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, WebMap data, NELOS data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the Target Cell Phones on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846, involving Marcel OXLEY SR., Cornel C. CARNEGIE, Stephen REESE, and Kristin CENDEJAS.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency

personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br>The Cellular Telephone Assigned Call Number (414) 813-3693 (Target Cell Phone 9) | Case No.24-867M(NJ)<br>Matter No. 2023R00283 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2.

located in the ______________ District of ______________________, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❒ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

❒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1) & 846 | Distribution of and possession with intent to distribute controlled substances, and conspiracy to distribute and possess with intent to distribute controlled substances |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☑ Delayed notice of 180 days *(give exact ending date if more than 30 days:* 12/11/2024 *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

KOSTANDEAN KAZAMIAS Digitally signed by KOSTANDEAN KAZAMIAS Date: 2024.06.13 17:08:12 -05'00'

*Applicant's signature*

Kostandean Kazamias, DEA SA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 6/17/2024

*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**APPLICATION FOR SEARCH WARRANTS**

I, Kostandean P. Kazamias, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for search warrants under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for information about the location of the cellular telephones assigned the following call numbers:

   a. (**310) 760-1161** (**Target Cell Phone 2**);

   b. **(323) 812-2879** (**Target Cell Phone 6**);

   c. **(323) 675-7829** (**Target Cell Phone 7**);

   d. **(414) 813-3693 (Target Cell Phone 9)**; and

   e. **(669) 322-6506 (Target Cell Phone 10)**, collectively, the **"Target Cell Phones**.**"**

2. The service provider for **Target Cell Phones 2** and **6** is T-Mobile US, Inc. ("Service Provider"), a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, New Jersey.

3. The service provider for **Target Cell Phone 9** is AT&T Corporation ("Service Provider") a wireless telephone service provider headquartered at 11760 U.S. Highway 1, North Palm Beach, Florida.

4. The service provider for **Target Cell Phones 7** and **10** is Verizon Wireless ("Service Provider") a wireless telephone service provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey.

5. T-Mobile US, Inc., AT&T Corporation, and Verizon Wireless are collectively referred to as the "Service Providers."

6. The **Target Cell Phones** are described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

7. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

8. I am a Special Agent with the Drug Enforcement Administration (DEA) and have been so employed since 2020. I am currently assigned to the Milwaukee District Office, Group 63. My duties include the investigation of drug trafficking organizations and violations of federal narcotics and money laundering laws, including, but not limited to offenses defined by 21 U.S.C. §§ 841, 843, and 846, and 18 U.S.C. §§ 1956 and 1957. I am an investigative or law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the

United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, and Section 2516.

9. I have received training in the area of narcotics investigations, money laundering, financial investigations, and various methods that drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of state and federal narcotics laws. I have participated or assisted in numerous federal and state search warrants for narcotic related offenses. I have experience in the investigation, apprehension, and prosecution of individuals involved in federal criminal offenses, the use of cellular devices to commit those offenses, and the available technology that can be used by law enforcement to assist in identifying the users of cellular devices and their location.

10. I have aided and participated in investigations that have led to the issuance of numerous search warrants involving violations of both state and federal narcotic laws. These warrants involved the search of locations including: residences of targets, their associates, and relatives, "stash houses" (houses used as drug/money storage locations), storage facilities, bank safe deposit boxes, cellular/camera phones, and computers. Evidence searched for and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized therefrom, monetary instruments, and various assets that were purchased with the proceeds of the drug trafficking.

11. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other case agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

12. Throughout this affidavit, reference will be made to case agents or officers. Case agents or officers are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your Affiant has had regular contact regarding this investigation.

13. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) (distribution and possession with the intent to distribute controlled substances) and 846 (conspiracy to distribute and possess with the intent to distribute controlled substances) have been committed, are being committed, and/or will be committed by Marcel OXLEY SR., Vincent NICHOLSON JR., Stephen REESE, Kristen CENDEJAS, and others. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

14. The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court

is a district court of the United States that has jurisdiction over the offenses being investigated; *see* 18 U.S.C. § 2711(3)(A)(i).

**PROBABLE CAUSE**

15. The Drug Enforcement Administration (DEA) and the North Central High Intensity Drug Trafficking Area (HIDTA) are currently investigating the drug trafficking activities of a multi-state Drug Trafficking Organization (DTO). During the course of the investigation case agents have identified multiple individuals involved in supplying multi-kilogram quantities of narcotics to Milwaukee, Wisconsin, and other areas. Evidence gathered during the course of this investigation reflects that Cornel C. CARNEGIE and Marcel D. OXLEY SR. are responsible for, and coordinating the movement of, multi-kilogram quantities of narcotics from California. The evidence further reflects that Aurion M. OXLEY, Tamara D. MONTGOMERY, Marcel D. OXLEY JR., Vincent L. NICHOLSON JR., and others work with OXLEY SR. and CARNEGIE to facilitate the movement of narcotics to, and store narcotics at, various stash locations in Milwaukee, Wisconsin. Case agents have discovered that at least some of the narcotics are transported via commercial airlines from California to Chicago, Illinois, and then to Milwaukee, Wisconsin. The narcotics are then supplied to multiple individuals in the Milwaukee area, to include Anthony T. WILKS, who distributes the narcotics from the restaurant and bar he operates known as Jack's Executive Bistro, located at 4923 W. Villard Avenue, Milwaukee, Wisconsin.

**DTO Transports DTO Proceeds and Drugs via Commercial Airlines and**
**<u>OXLEY SR., NICHOLSON, and others Supply WILKS at Jack's Bistro</u>**

16. From June 2023 through present, case agents conducted several interviews with SOI #1. SOI #1 told case agents that various members in the DTO are smuggling kilogram quantities of various types of controlled substances, including fentanyl, crystal methamphetamine, heroin, and cocaine, on commercial airlines from California to Chicago O'Hare International Airport (ORD) by paying TSA agents to get the narcotics through airport security. More specifically, according to SOI #1, DTO members give the narcotics to TSA agents outside of the airport, typically in a black Swiss Gear backpack, and the TSA agents then bring the narcotics in the black Swiss Gear backpack through security. The TSA agents then give the backpack containing the narcotics to a different member in the DTO who is scheduled to take the flight and who has already gotten through airport security. Once the narcotics arrive in Chicago, SOI #1 stated that a courier transports the narcotics to Milwaukee, Wisconsin, typically in an Uber. According to SOI #1, the DTO facilitates weekly narcotics trips from California to ORD, and the DTO keeps TSA agents on "payroll" for the DTO.

17. SOI #1 further stated that, in much the same fashion, the DTO uses commercial airlines from ORD to California to facilitate the movement of drug proceeds in the form of bulk cash U.S. currency. SOI #1 stated that in 2022, on various occasions, SOI #1 went to ORD with a black Swiss Gear backpack containing drug proceeds. SOI #1 stated that SOI #1 has gone to ORD with Tamera MONTGOMERY, Marcel OXLEY SR., Marcel OXLEY JR. (OXLEY SR.'s son), Aurion OXLEY (OXLEY SR.'s daughter), and

Vincent NICHOLSON JR. (NICHOLSON). SOI #1 stated that when SOI #1 arrived at ORD, a TSA employee met SOI #1 and SOI #1's associates at the vehicle they arrived in and took the black Swiss Gear backpack containing the drug proceeds. The TSA employee took the backpack containing drug proceeds through security and gave it to another DTO member who subsequently transported it to California. Additionally, SOI #1 stated that the TSA employee would receive a few thousand U.S. dollars as payment for transferring the backpack containing the drug proceeds to the airline passenger involved with the DTO.

18. Law enforcement records reflect that bulk U.S. currency was seized from various DTO members at an airport in 2018. More specifically, on May 18, 2018, at the Cincinnati/Northern Kentucky International Airport in the B Concourse, case agents from DEA Cincinnati RO and the Cincinnati/Northern Kentucky Airport Police Department reviewed flight manifests and discovered suspicious flight itineraries for OXLEY SR., Aurion OXLEY, and Rosie ANDERSON. Case agents engaged in a consensual encounter with these three individuals and stated they were looking for weapons, narcotics, or large sums of money travelling though the airport. Case agents asked OXLEY SR., Aurion OXLEY, and ANDERSON if officers could search their luggage, and all three individuals consented to the search. During the search of OXLEY SR., Aurion OXLEY, and ANDERSON, case agents located U.S. currency in a large white envelope on each of them. Case agents seized approximately $27,469 U.S. dollars in total from OXLEY SR. ($7,715), Aurion OXLEY ($8,814), and ANDERSON ($10,940).

19. SOI #1 stated that SOI #1 has been to Jack's Executive Bistro approximately four times in the past to facilitate the distribution of multi-kilogram quantities of cocaine and to pick up illicit drug proceeds. Case agents displayed a Wisconsin Department of Transportation photo of Anthony T. WILKS to SOI #1, and SOI #1 positively identified the individual depicted in this photograph as "ANT," who is the owner of Jack's Executive Bistro. Specifically, SOI #1 stated that in October 2022, SOI #1 went to Jack's Executive Bistro approximately four times with NICHOLSON, at which time NICHOLSON brought approximately two to three kilograms of cocaine into the bar each time. SOI #1 stated SOI #1 remained in the car while NICHOLSON went inside on each time except for the first delivery when SOI #1 went into the bar. Furthermore, SOI # 1 stated that SOI #1 went back to Jack's Executive Bistro a few days after the first two cocaine deliveries with NICHOLSON and/or NICHOLSON and OXLEY SR. to pick up the drug proceeds.

20. Over the course of the investigation, SOI #1 has identified OXLEY SR.'s cellular telephone number as **Target Cell Phone 2.**

21. Beginning in June of 2023, SOI #1 made statements against SOI #1's penal interest. The information provided by SOI #1 is consistent with evidence gathered during the course of this investigation where SOI #1 was not used, and much of SOI #1's information has been corroborated through independent investigation, including law enforcement records, toll records, and surveillance. SOI #1's criminal history includes convictions for felon in possession of a firearm, bail jumping felony, possess

with intent to distribute THC, and possess with intent to distribute THC. SOI #1 is cooperating in exchange for consideration related to SOI #1's involvement in narcotics trafficking (charges not currently pending). Finally, SOI #1 has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed herein, unless otherwise noted. Within the context of the information detailed and relied upon for purposes of this affidavit, case agents believe SOI #1 is credible and SOI #1's information reliable.

**WILKS Distributes Narcotics from Jack's Executive Bistro**

22. On or about February 28, 2023, case agents met with a confidential source (CS), who informed case agents that the CS knew of an individual who goes by "ANT," later identified as Anthony T. WILKS, who distributes multi-kilogram quantities of cocaine, fentanyl, and marijuana in the Milwaukee, Wisconsin area. The CS stated that WILKS is a member of the "BGM," "Bosses Get Money." The CS stated that WILKS is known to store and distribute multi-kilogram quantities of cocaine, fentanyl, and marijuana at Jack's Executive Bistro. The CS further stated that the CS has purchased approximately two kilograms of cocaine approximately three to four times from WILKS in the spring/summer of 2022 and paid approximately $23,000 per one kilogram of cocaine.

23. Beginning in January of 2023, the CS made statements against the CS's penal interest. The information provided by the CS is consistent with evidence gathered during the course of this investigation where the CS was not used, and much of the CS's

information has been corroborated through independent investigation, including law enforcement records and toll records, as well as a controlled purchase of controlled substances. The CS is cooperating for consideration relating to law enforcement activity that exposes the CS to drug trafficking charges and firearm charges, which charges have not yet been filed or presented to a grand jury. The CS's criminal history includes convictions for conspiracy to possess with intent to distribute and to distribute cocaine, battery, resisting or obstructing an officer (3 counts), keeping a drug house, disorderly conduct, possession of marijuana (2nd offense), and escape. The CS also has juvenile convictions. Finally, the CS has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed herein. Within the context of the information detailed and relied upon for purposes of this affidavit, case agents believe the CS is credible and the CS's information reliable.

24. Throughout the course of the investigation, case agents have conducted a controlled buy. Based on my training and experience, I know a "controlled buy" is a law enforcement operation in which an informant purchases drugs from the target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When an informant is used, he/she is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and/or a monitoring device. When the transaction is completed, the informant meets case agents at a pre-determined meet location and

gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money and then interviewed by the case agents about the drug transaction. A sample of the suspected drugs is field tested by the case agents for the presence of controlled substances and then placed in inventory pursuant to normal inventory procedures.

25. On or about August 24, 2023, under the direction and control of case agents, the CS arrived at Jack's Executive Bistro and purchased approximately 535 gross grams of cocaine for $10,000 U.S. currency from WILKS. The controlled buy occurred in a separate room inside Jack's Executive Bistro. After obtaining the cocaine from WILKS, which was located inside of a white Styrofoam container in a black bag, the CS gave the cocaine to case agents.

**OXLEY DTO Supplies Narcotics to WILKS at Jack's Executive Bistro**

26. Since at least July 2023, electronic surveillance has reflected that NICHOLSON and OXLEY SR. go to Jack's Executive Bistro, 4923 W. Villard Avenue, to meet with WILKS. Members of the DTO, to include OXLEY SR. and NICHOLSON, frequently use a 2018 Ford Explorer bearing Wisconsin Registration AMZ-7539 (Subject Vehicle 3) to facilitate DTO activities, including going to Jack's Executive Bistro. Subject Vehicle 3 lists to a Tamera Denise MONTGOMERY at 1608 N. 10th Street, Milwaukee, Wisconsin.[1] Case agents further believe based on their training, experience, and

[1] Multiple federal search warrants for the GPS data for Subject Vehicle 3 have been authorized during the course of this investigation.

familiarity with this investigation that in many instances, OXLEY SR. and NICHOLSON were not at Jack's Executive Bistro to patronize the establishment. Rather, they were there to meet with WILKS to facilitate the DTO. In part, this belief is based on their visits that occur during hours in which Jack's Executive Bistro is not open to the public, the short duration of the visits, and the fact that they are observed carrying bags in/out of the Bistro. Operational hours for Jack's Executive Bistro reflect that the establishment is closed on Mondays and Sundays, open from 4:00 p.m. to 1:30 a.m. on Tuesday, Wednesday, and Thursday, and open from 4:00 p.m. to 2:00 a.m. on Friday and Saturday.

*OXLEY SR.*

27. For example, court authorized location data for **Target Cell Phone 2** reflected that **Target Cell Phone 2** (OXLEY SR.) was located in the vicinity of ORD on December 22, 2023, in the afternoon hours, and that it subsequently traveled to the Milwaukee area that same day.[2] Between approximately 10:34 p.m. on December 22, 2023, through approximately 2:14 a.m. on December 23, 2023, **Target Cell Phone 2** was in the general vicinity of Jack's Executive Bistro. **Target Cell Phone 2** then traveled to the vicinity of 4333 N. 37th Street, Milwaukee, Wisconsin, a residence known to be used by several members of the DTO. In addition, on December 24, 2023, at approximately

---

[2] Multiple federal search warrants for the location data for **Target Cell Phone 2** have been authorized during the course of this investigation.

2:44 a.m. through at least 3:04 a.m., **Target Cell Phone 2** was again in the general vicinity of Jack's Executive Bistro.

28. On January 23, 2024, into the early hours of January 24, 2023, while conducting electronic surveillance at Jack's Executive Bistro, case agents observed WILKS, OXLEY SR., and multiple unidentified individuals at the establishment. At approximately 8:20 p.m., case agents observed a white Lexus arrive at Jack's Executive Bistro and observed a male matching the physical descriptors for WILKS operating the white Lexus. At approximately 9:33 p.m., case agents observed a black Jeep arrive at Jack's Executive Bistro. Approximately a few minutes later, case agents observed OXLEY SR. and multiple individuals walk from the direction of the black Jeep and enter Jack's Executive Bistro. At approximately 10:55 p.m., case agents observed a grey Ford Explorer, believed to be Subject Vehicle 3, arrive at Jack's Executive Bistro. At approximately 11:46 p.m., case agents observed OXLEY SR. and an unidentified male exit Jack's Executive Bistro, and neither were observed carrying anything in their hands. Case agents observed OXLEY SR. walk towards the rear passenger side of the black Jeep and the unidentified male stand near the black Jeep. A few moments later, case agents observed OXLEY SR., now carrying a medium duffle-style bag, and the unidentified male enter Jack's Executive Bistro.

29. On January 24, 2024, at approximately 12:38 a.m., while continuing electronic surveillance at Jack's Executive Bistro, case agents observed an unidentified male walk towards the establishment carrying what appeared to be a large backpack.

Case agents further observed what appeared to be security staff searching the backpack the unidentified male was carrying. However, case agents did not observe security staff searching the medium duffle-style bag OXLEY SR. walked into the establishment with earlier. At approximately 2:09 a.m., case agents observed OXLEY SR., who was not now carrying the duffle-style bag, and multiple unidentified males exit Jack's Executive Bistro. At approximately 2:14 a.m., case agents observed WILKS exit Jack's Executive Bistro and observed what appeared to be WILKS locking the establishment. Shortly after, case agents observed the white Lexus, black Jeep, and grey Ford Explorer depart Jack's Executive Bistro.

30. On February 20, 2024, at approximately 9:17 p.m., electronic surveillance reflected a grey Ford Explorer arrive in the parking lot of Jack's Executive Bistro. GPS data for Subject Vehicle 3 reflected that Subject Vehicle 3 was in the parking lot of Jack's Executive Bistro on February 20, 2024, at approximately 9:19 p.m. At approximately 9:32 p.m., case agents observed OXLEY SR. enter Jack's Executive Bistro. Due to technical issues with the electronic surveillance, case agents were unable to observe OXLEY SR. exiting Jack's Executive Bistro. At approximately 9:54 p.m., case agents observed the grey Ford Explorer depart Jack's Executive Bistro.

31. On February 21, 2024, at approximately 12:22 a.m., electronic surveillance at Jack's Executive Bistro reflected a grey Ford Explorer arrive at Jack's Executive Bistro. GPS data for Subject Vehicle 3 reflected that Subject Vehicle 3 was in the parking lot of Jack's Executive Bistro on February 21, 2024, at approximately 12:23 a.m. Due to the

positioning of electronic surveillance, case agents could not observe any individuals exit and or enter the grey Ford Explorer. However, location data for **Target Cell Phone 2** reflected the phone was in the general vicinity of Jack's Executive Bistro, leading case agents to believe that OXLEY SR. was operating Subject Vehicle 3 at Jack's Executive Bistro on this day. At approximately 12:44 a.m., case agents observed the grey Ford Explorer depart Jack's Executive Bistro.

32. On February 22, 2024, at approximately 10:30 p.m., electronic surveillance at Jack's Executive Bistro reflected a grey Ford Explorer arrive at Jack's Executive Bistro. At approximately 10:32 p.m., case agents observed OXLEY SR. exit the grey Ford Explorer and walk towards Jack's Executive Bistro, but were unable to observe OXLEY SR. enter the establishment. At approximately 10:47 p.m., case agents observed OXLEY SR. exit Jack's Executive Bistro with WILKS. Shortly after, case agents observed OXLEY SR. enter the driver side door of the grey Ford Explorer and depart Jack's Executive Bistro. At approximately 11:58 p.m., case agents observed the grey Ford Explorer arrive at Jack's Executive Bistro again. On February 23, 2024, at approximately 12:36 a.m., case agents observed the grey Ford Explorer depart Jack's Executive Bistro. Location data for **Target Cell Phone 2** and GPS data for Subject Vehicle 3 leads case agents believe OXLEY SR. was operating Subject Vehicle 3 and was at Jack's Executive Bistro on February 22, and February 23, 2024.

33. On March 8, 2024, at approximately 6:40 p.m., while conducting electronic surveillance at Jack's Executive Bistro, case agents observed a grey Ford Explorer arrive

in the parking lot. Due to the angle of the electronic surveillance, case agents were unable to observe anyone exit the vehicle, however location data for **Target Cell Phone 2** and Subject Vehicle 3 indicated both were in the general vicinity of Jack's Executive Bistro at approximately this same time. At approximately 6:42 p.m., case agents observed three unidentified males walk from the direction of where the grey Ford Explorer parked and enter Jack's Executive Bistro. It appeared that one of the unidentified males was carrying a backpack. At approximately 7:26 p.m., case agents observed OXLEY SR. and two unidentified males exit Jack's Executive Bistro and walk towards the direction of where the grey Ford Explorer parked. It now appeared OXLEY SR. and the two unidentified males were not carrying a backpack upon their exit from the Bistro. At approximately 7:27 p.m., case agents observed the grey Ford Explorer depart Jack's Executive Bistro.

34. Based on case agents' training and experience, case agents believe OXLEY SR.'s trips to Jack's Executive Bistro, as described above, were for the purpose of facilitating narcotics and/or money transactions with WILKS.

*NICHOLSON*

35. On April 9, 2024, GPS data for Subject Vehicle 3 reflected that Subject Vehicle 3 was at ORD and subsequently travelled northbound towards the Mariner Apartment Complex, a DTO associated residence as more fully described below. On this same day, at approximately 3:12 p.m., case agents observed WILKS arrive at Jack's Executive Bistro. At approximately 3:31 p.m., GPS data for Subject Vehicle 3 reflected

that Subject Vehicle 3 was at Jack's Executive Bistro. Additionally, electronic surveillance confirmed both Subject Vehicle 3 and NICHOLSON JR., were at Jack's Executive Bistro. Through electronic surveillance, case agents observed NICHOLSON JR. enter Jack's Executive Bistro. NICHOLSON JR. remained in Jack's Executive Bistro for approximately 12 minutes. Case agents then observed WILKS and NICHOLSON JR. exit Jack's Executive Bistro and subsequently depart in separate vehicles. Based on their training, experience, and familiarity with this investigation, case agents believe that the short duration trip to Jack's Executive Bistro after returning from ORD and during non-operational hours is indicative of a narcotics-trafficking meeting and/or transaction.

**Movement of Narcotics From LAX to ORD to Milwaukee in April and May 2024**

36. During the course of this investigation, law enforcement agents have identified individuals employed by the Transportation Security Administration (TSA) and by the LAX airport that case agents suspect are involved in smuggling narcotics from LAX to ORD, before the narcotics are eventually brought to Milwaukee for distribution. Phone records and surveillance footage has led agents to believe that Stephen M. REESE (DOB: xx/xx/1978), an employee at the LAX airport, and California-based TSA employee Jasmine STEWART are assisting the DTO by bringing suspected controlled substances into LAX and thereafter providing the controlled substances to other DTO members who fly them to ORD. Further, over the course of the investigation, case agents identified Kristen L. CENDEJAS (x/x/1990) and Michelle CARTER as members of the OXLEY SR. DTO that facilitate the movement of narcotics through

commercial air travel. Furthermore, SOI#1 has positively identified both CARTER and CENDEJAS. SOI#1 has identified CARTER as OXLEY SR.'s "other lady" and CENDEJAS as "Kristen."

37. Case agents reviewed footage from LAX and ORD on April 11, 2024. Surveillance footage from LAX depicted Stephen REESE meet with CENDEJAS at approximately 4:14 a.m. PST, and the two appeared to exchange backpacks. Before this exchange, REESE, at **Target Cell Phone 6**, received calls from (669) 322-6506 (**Target Cell Phone 10**) on April 10, 2024 (PST), at approximately 11:11 p.m., and April 11, 2024, at approximately 3:28 a.m., and approximately 4:13 a.m., moments before REESE and CENDEJAS met with each other. Initially, case agents believed **Target Cell Phone 10** was another phone being used by CENDEJAS. However, on a later date while physically surveilling CENDEJAS, case agents called **Target Cell Phone 10** and a male voice answered. Therefore, case agents believe the user of **Target Cell Phone 10**, FNU LNU, contacted REESE to coordinate the exchange of backpacks with CENDEJAS.

38. Preceding this meeting, on April 10, 2024, at approximately 11:54 p.m. (CST), OXLEY SR., using (760) 447-4257, or Target Cell Phone 4, was in contact with STEWART. Additionally, on Thursday, April 11, 2024, at 10:16 a.m., 10:36 a.m., 1:01 p.m., 1:24 p.m., and 1:46 p.m., NICHOLSON JR., using (562) 253-6441, or Target Cell Phone 5, and at 10:23 a.m. and 1:13 p.m., Target Cell Phone 4 (OXLEY SR.), were in communication with CARTER, at (414) 888-9090, or Target Cell Phone 8. Additionally,

at approximately 2:36 a.m. and at 5:08 a.m., **Target Cell Phone 2** (OXLEY SR.) was in contact with CENDEJAS at **Target Cell Phone 7**.

39. On Thursday, April 11, 2024, while monitoring GPS data for Subject Vehicle 3, case agents observed Subject Vehicle 3 travel to 5310 N. 60th Street, Milwaukee, WI, a residence associated with CARTER, at approximately 10:58 a.m. Subject Vehicle 3 then traveled southbound on I-94. Case agents continued monitoring GPS data and observed Subject Vehicle 3 was at ORD, at which time case agents were able to physically observe Subject Vehicle 3.

40. At approximately 12:26 p.m., case agents observed Subject Vehicle 3 parked in terminal 2 at ORD. At that point, case agents did not observe anyone enter or exit Subject Vehicle 3. Subject Vehicle 3 subsequently left terminal 2 and stopped at terminal 3, prior to departing ORD and ultimately going to the Fashion Outlets of Chicago located at 5220 Fashion Outlets Way, Rosemont, IL.

41. Surveillance footage from ORD reflected CARTER being dropped off by Subject Vehicle 3 at terminal 2, at which point CARTER entered ORD and subsequently walked inside an airport bathroom at approximately 12:39 p.m., at the same time CENDEJAS was in this same bathroom. CARTER entered the bathroom with what appeared to be an empty backpack and exited carrying a backpack that appeared to contain items. Case agents believe that CARTER and CENDEJAS switched backpacks while inside the bathroom. CARTER then re-entered Subject Vehicle 3 and left the area.

42. Telephone toll analysis revealed that at approximately 12:39 p.m., Target Cell Phone 8 (CARTER) placed an outgoing call to **Target Cell Phone 7** (CENDEJAS). At approximately 1:01 p.m., Target Cell Phone 8 (CARTER) received an incoming call from Target Cell Phone 5 (NICHOLSON JR.). At approximately 1:13 p.m., Target Cell Phone 8 (CARTER) placed an outgoing call to Target Cell Phone 4 (OXLEY SR.). Additional telephone toll analysis revealed that at approximately 1:24 p.m., Target Cell Phone 8 (CARTER) placed another outgoing call to **Target Cell Phone 7** (CENDEJAS). At approximately 1:25 p.m. and 1:46 p.m., Target Cell Phone 8 (CARTER) placed outgoing calls to Target Cell Phone 5 (NICHOLSON JR.).

43. At approximately 1:46 p.m., Subject Vehicle 3 re-entered arrivals at ORD and drove through slowly prior to departing the airport and driving north towards Milwaukee, WI. Case agents were unable to continuously follow Subject Vehicle 3 north towards Milwaukee, WI area but they continued to monitor the GPS data and established surveillance on Subject Vehicle 3 as it approached the Milwaukee, WI, area.

44. At approximately 3:31 p.m., case agents observed Subject Vehicle 3 pull over and park in front of 5310 N. 60th Street, Milwaukee, WI, the same residence Subject Vehicle 3 traveled to prior to departing for Chicago. Case agents then observed a light skinned B/F exit the front passenger seat of Subject Vehicle 3 wearing a light-colored sweatshirt, light colored sweatpants, and a green stocking hat, later identified as CARTER. CARTER was not carrying a backpack upon exiting Subject Vehicle 3. Case agents additionally observed a Honda Pilot parked in the driveway of the

residence. Subsequently, case agents observed Subject Vehicle 3 perform a U-Turn and departed southbound on N. 60th Street.

45. At approximately 3:41 p.m., case agents drove past 5310 N. 60th Street and observed CARTER sitting on the concrete step in front of the front door. Additionally, case agents observed that the Honda Pilot was bearing WI Registration AVT-7542. A subsequent query of the WI DOT revealed the Honda Pilot was bearing WI Registration AVT-7542 registered as follows: AVT-7542, WI, 2003 Honda Pilot SUV, Green, 2HKYF18593H594621, Michelle Aueva CARTER, DOB: xx/xx/1997, Address: 8559 N. Granville Road #202, Milwaukee, WI. Case agents viewed the WI Driver's License photographs of CARTER and confirmed she was the individual who exited the front passenger seat of Subject Vehicle 3.

46. Case agents continued to monitor the location of Subject Vehicle 3. After dropping off CARTER, Subject Vehicle 3 stopped at Walgreens for a brief period, then traveled directly to the Mariner Apartment. Upon arrival, case agents observed NICHOLSON JR. walk from the direction of Subject Vehicle 3 towards apartment #15 at the Mariner apartment complex, carrying a black backpack.

47. Based on the aforementioned toll analysis, in conjunction with physical and electronic surveillance, case agents believe OXLEY SR. communicated with members of the DTO to facilitate illegal narcotics to get through airport security at LAX. Case agents believe that REESE brought the narcotics in the black backpack, thereby bypassing airport security. Once the narcotics bypassed airport security, REESE met

CENDEJAS to facilitate the transfer of narcotics. Once the transfer was complete, CENDEJAS then flew the narcotics from LAX to ORD via United Airlines flight #1332. OXLEY SR. also communicated with CARTER, who coordinated with NICHOLSON JR., to travel to ORD to meet with CENDEJAS. Upon arrival at ORD, CARTER entered the airport at which point case agents believe CARTER obtained the black backpack containing narcotics from CENDEJAS. CARTER then traveled back to Milwaukee with NICHOLSON JR. in Subject Vehicle 3. After NICHOLSON JR. dropped CARTER off at a residence associated with CARTER, NICHOLSON JR. then returned to the Marnier Apartment Complex with the backpack containing the narcotics.

48. Case agents conducted electronic surveillance on numerous other occasions and case agents observed what appeared to be REESE meet with OXLEY JR. at LAX on May 12, 2024, and REESE meet with CENDEJAS on May 13, 2024 at LAX.

49. On May 12, 2024, at approximately 4:25 a.m. (PST), it appeared to case agents that REESE saw OXLEY JR. and walked towards his direction. Case agents observed REESE stand up and walk towards elevator T6-9. It appeared to case agents that REESE was in possession of a black colored "Swiss Gear" Scan Smart TSA laptop style backpack. The backpack contained a distant latch in the middle of the backpack. Meanwhile, case agents observed OXLEY JR. also walk towards the area of elevator T6-9 and appeared to briefly make eye contact with REESE who was waiting for the elevator doors to open. REESE entered the elevator and OXLEY JR. took the escalator to lower-level arrivals / tunnel area. At approximately 4:26 a.m. (PST), case agents

observed OXLEY JR. arrive at the lower-level arrival / tunnel area. At approximately 4:27 a.m. (PST), case agents observed REESE walk away from the lower-level arrivals / tunnel are and observed REESE northbound through an employee / passenger exit tunnel that leads to the arrivals / baggage claim area. It appeared to case agents that REESE was in possession of a black colored "Swiss Gear" 3258 Laptop style backpack with a distinct vertical grey colored strap with a latch, which ran along the bottom portion of the backpack. This was the same style backpack OXLEY JR. possessed shortly before meeting with REESE in the area of the lower-level / tunnel area. At approximately 4:28 a.m. (PST), case agents observed OXLEY JR. on the escalator from the lower-level departure level, and subsequently walk northbound through the terminal. Case agents observed OXLEY JR. in possession of a "Swiss Gear" Scan Smart TSA Laptop back pack. This is the same style backpack REESE possessed shortly before meeting with OXLEY JR.

50. On May 13, 2024, at approximately 4:25 a.m. (PST), it appeared to case agents that REESE stood up once he saw CENDEJAS at LAX. Case agents then observed CENDEJAS follow REESE to elevator T6-9. It appeared to case agents that both REESE and CENDEJAS were in possession of black colored "Swiss Gear" Scan Smart TSA Laptop style backpacks. Approximately a few second later, both REESE and CENDEJAS entered the elevator together. At approximately 4:27 a.m. (PST), case agents observed CENDEJAS walk towards a restroom in the area of Gate 65. CENDEJAS was still in possession of her suitcase and black colored "Swiss Gear" backpack. After

approximately one minute, CENDEJAS exited the restroom and walked northbound though Terminal 6 and onto Terminal 7, Gate 71B. Meanwhile, at approximately 4:29 a.m. (PST), case agents observed REESE exit the sterile area of the airport. Case agents observed REESE in possession of the backpack.

51. Case agents believe that on May 12, 2024, and May 13, 2024, REESE met with OXLEY JR. and CENDEJAS at LAX to bring narcotics past security and conduct a narcotics transaction.

**June 5, 2024, Seizure of 10 Kilograms of Cocaine**

52. Based on electronic and physical surveillance, case agents were aware OXLEY SR. was at ORD and travelled to Milwaukee, WI on June 2, 2024.

53. During the morning hours of June 4, 2024, court-authorized location data for **Target Cell Phone 2** (OXLEY SR.) and Target Cell Phone 8 (CARTER) revealed both traveled from Milwaukee to the area of ORD, seemingly together. At approximately 6:32 a.m., **Target Cell Phone 2**, and at 6:38 a.m., Target Cell Phone 8 were in the immediate vicinity of ORD. As time passed, **Target Cell Phone 2** traveled northbound to Milwaukee while Target Cell Phone 8 remained at ORD. Therefore, case agents believed OXLEY SR. drove CARTER to ORD so she could take a flight while he returned to Milwaukee.

54. Flight records and location data for Target Cell Phone 8 revealed CARTER, after a brief layover at the Salt Lake City International Airport, flew into the Long Beach (CA) Airport at approximately 2:07 p.m.

55. Later that same day, at approximately 8:05 p.m. and 8:06 p.m. (PST), REESE, at **Target Cell Phone 6**, received calls from FNU LNU using **Target Cell Phone 10**. Beginning at approximately 8:37 p.m. (PST), Target Cell Phone 8 (CARTER) was in the immediate vicinity of LAX where it stayed. At approximately 8:43 p.m. (PST), **Target Cell Phone 6** (REESE) was also in the immediate vicinity of LAX until approximately 9:51 p.m. (PST). At approximately 8:52 p.m., 9:01 p.m., and 9:13 p.m. (PST) REESE, using **Target Cell Phone 6**, called FNU LNU at **Target Cell Phone 10**.

56. At approximately 8:30 p.m. (PST), phone data for **Target Cell Phone 6** reflected that **Target Cell Phone 6** (REESE) was in the vicinity of Terminal 6 of LAX. Additionally, at approximately 8:52 p.m. PST, phone data for Target Cell Phone 8 (CARTER) reflected that Target Cell Phone 8 was also in the vicinity of Terminal 6. Shortly after, case agents responded to LAX.

57. Case agents reviewed electronic surveillance at LAX and observed the following. At approximately 9:03 p.m. (PST), case agents observed REESE in the area of elevator T6-9, on the gate / departure level of Terminal 6. REESE was observed to be in possession of a black colored backpack and sat near the area of Gate 67. At approximately 9:10 p.m. (PST), CARTER completed the Transportation Security Administration screening process. CARTER was in possession of a black colored "Swiss Gear" Scan Smart TSA laptop backpack. At approximately 9:14 p.m. (PST), case agents observed CARTER reach the area of elevator T6-9. REESE, while in possession of the dark colored backpack, appeared to see CARTER near the elevator and then walked

through a door that leads to the lower-level / tunnel area. Approximately a few seconds later, CARTER walked into elevator T6-9, which also leads to the lower-level / tunnel area. At approximately 9:16 p.m. (PST), REESE took the escalator from the lower-level tunnel area, to the departure level. REESE was then observed walking northbound through the departure level and eventually exited the terminal and subsequently walked to the area of the LAX parking structure P5 / P6. Surveillance footage captured REESE in possession of a similar backpack (black colored "Swiss Gear" Scan Smart TSA Laptop backpack) as CARTERS's. Based on the orientation of the backpack's zippers, it appeared to be the backpack CARTER possessed before meeting with REESE in the lower-level / tunnel area. At approximately 9:16 p.m. (PST), CARTER walked from the same area where REESE took the escalator from the lower-level / tunnel area to the departure level. Based on surveillance footage, the backpack CARTER was carrying appeared different from the one she had minutes earlier before meeting REESE. The backpack appeared to be weighed down and the orientation of the zippers were not the same as seen approximately two minutes earlier, prior to meeting REESE.

58. At approximately 11:20 p.m. (PST), investigators responded to Terminal 5, Gate 53, to locate CARTER before her departure flight. Investigators located CARTER laying down on the ground behind the American Airline ticket counter near Gate 53A. Investigators observed what appeared to be the same black colored "Swiss Gear" backpack from surveillance footage, which was sitting on the ground, approximately 6 inches away from CARTER. No other passengers were in the immediate area of the

backpack. At approximately 11:48 p.m. (PST), case agents exposed narcotic detection K-9 "Casey" to the general area where CARTER was laying down. Investigators advised that K-9 "Casey" had alerted to the black colored "Swiss Gear" backpack sitting next to CARTER. Case agents, who were in plainclothes, approached CARTER. Investigators lightly tapped CARTER on her shoulder to wake her up. Investigators displayed to CARTER their DEA credentials and identified themselves as law enforcement. Investigators explained to CARTER that a K-9 had alerted to the scent of narcotics coming from her black colored "Swiss Gear" backpack that was sitting next to her. Investigators asked CARTER if she was willing to accompany them to the LAX Narcotics Task Force (LAXNTF) office to discuss the contents inside her black colored "Swiss Gear" backpack. CARTER stood up, picked up her black colored handbag with multicolor lettering & the black colored "Swiss Gear" backpack and agreed to walk back to the LAXNTF office. While walking to the LAXNTF office, CARTER maintained possession of her handbag and backpack. CARTER asked investigators how long it would take because she needed get back to her child and her sick mother. Investigators explained to CARTER that it was a 5-minute walk to the LAXNTF office. While at the LAXNTF office, investigators explained to CARTER that a narcotic K-9 had alerted interest in her backpack. Investigators asked for consent to search the bags in her possession. CARTER verbally agreed and signed a DEA Consent Form, giving investigators consent to search her bags. Investigators searched the black colored handbag with multicolored lettering and discovered it contained miscellaneous

women's clothing, toiletries, and shoes. The handbag also contained two Delta Airlines boarding passes dated June 4, 2024, for Delta flights 2426, ORD – SLT and Delta flight 855, SLT – Long Beach, both under the name of "CARTER/MICHELLE." Investigators searched a pink colored coin purse, which contained a Wisconsin Identification Card No. C636-5419-7808-09 and Visa Debit Card, last four 4610 both under the name of Michelle CARTER. Investigators then searched the black colored "Swiss Gear" backpack. Investigators opened the main compartment of the backpack and discovered 10 kilogram-sized vacuum-sealed packages. As investigators were taking out each kilogram vacuum-sealed package, CARTER spontaneously stated the following: "what the fuck is that, that is not my bag", "what is that, that's drugs, that's what the dog was smelling." CARTER claimed she had shopping bags, stuff from Ross, Walmart, and Target. CARTER also said, "What is that, that don't look like no weed." Investigators conducted a presumptive test using the TruNarc Raman spectrometer handheld device of the white powdery substance inside of one of the kilogram-sized packages. The presumptive test of the white powdery substance tested positive for Cocaine Hydrochloride. Case agents weighed the 10 kilogram-sized vacuum-sealed packages, which weighed approximately 11.76 kilograms (including the packaging).

59. CARTER gave both verbal and written consent to search her cellular telephone by signing the DEA Consent to Search From. Case agents reviewed CARTER's cellphone and discovered that **Target Cell Phone 10** was saved in her phone

as "BIGbro." **Target Cell Phone 10** contacted CARTER at approximately 12:00 p.m. (PST) on June 4, 2024, and again at approximately 1:11 a.m. (PST) on June 5, 2024.

## The Target Cell Phones

60. Subscriber Information for **Target Cell Phone 2** reflects that the subscriber is OXLEY SR. with a listed address of 6059 Autry Avenue, Lakewood, California.

61. Case agents know that on multiple occasions OXLEY SR. has listed **Target Cell Phone 2** when reserving flights and vehicles, including a flight from ORD to Las Vegas International Airport in October 2023, a rental vehicle through Ace Rent A Car in November 2023, a flight from ORD to LAX in December 2023, a flight from LAX to ORD in December 2023, and a flight from Philadelphia to LAX, and then from LAX to Sacramento in April 2024.

62. Phone data reflects that **Target Cell Phone 2** has communicated on multiple occasions with phone numbers believed to be used by Aurion OXLEY ((424) 467-5897, (213) 479-2841, and (470) 494-8271)), Marcel OXLEY JR. ((323) 542-9324), MONTGOMERY ((414) 439-9865), Cornell CARNEGIE ((407) 307-7080)), and Anthony WILKS ((414) 202-7024) over the course of the investigation.

63. Subscriber Information for **Target Cell Phone 6** reflects that the subscriber is Stephen REESE, with a listed address of 4182 3 / 4 Leimert Boulevard, Los Angeles, California. Phone data reflects that between December 20, 2023 and April 25, 2024, **Target Cell Phone 6** has communicated with OXLEY SR. at Target Cell Phone 4 approximately 11 times. Between September 4, 2023, to November 23, 2023, **Target Cell**

**Phone 6**, has communicated with the OXLEY SR. Prior Drug Phone approximately 5 times. Furthermore, **Target Cell Phone 6** has been in contact with prior numbers believed to be used by OXLEY SR. ((323) 547-3915 and (262) 327-8509) approximately 64 times between June 22, 2022 and September 8, 2023.

64. Subscriber Information for **Target Cell Phone 7** reflects that the subscriber is Kristen CENDEJAS with a listed address of 3700 Avalon Street Apt# B5, Riverside, California.

65. Subscriber Information for **Target Cell Phone 9** reflects that **Target Cell Phone 9** is subscribed to Unknown Unknown, with a listed address of 123 Unknown Unknown, Milwaukee, WI, 53216. **Target Cell Phone 9** is believed to be used by OXLEY SR. for the following reasons:

a. Through phone toll analysis, case agents identified a previous number for OXLEY SR.—(657) 337-1086 (hereinafter referred to as OXLEY SR. Prior Drug Phone)—which was subscribed to "Shon Jones" at 7762 Beach Boulevard, Buena Park, California. The OXLEY SR. Prior Drug Phone listed an email address of LLLWGANGGANG@icloud.com, the same email address listed for Target Cell Phone 4.

b. Case agents identified the email address of tbgbixx111@icloud.com, under the account name "Dishon Jones." The address listed for the iCloud account under Dishon Jones is 4174 N. 67th Street, Milwaukee, Wisconsin. This address actually does not exist, but OXLEY SR.'s listed address through Wisconsin Department of Transportation is 4174 N. 68th Street, Milwaukee, Wisconsin, leading case agents to believe that OXLEY SR. simply made a typographical error in the street name when setting up the account.

c. Case agents believe that OXLEY SR. is using the alias of Dishon Jones or "Shon Jones," who is believed to be a close friend or

relative to OXLEY SR. who was killed in a shooting in 2002 in California.

d. A common call analysis between the OXLEY SR. Prior Drug Phone and **Target Cell Phone 2** reflects that the OXLEY SR. Prior Drug Phone was in contact with phone numbers believed to be used by several other DTO members, including most notably, Tamara MONTGOMERY. OXLEY SR communicated with MONTGOMERY using the OXLEY SR. Prior Drug Phone until November 23, 2023. Beginning November 24, 2024 and through at least April 29, 2024, OXLEY SR. has used **Target Cell Phone 2** to communicate with MONTGOMERY.

e. An analysis of telephone records for the OXLEY SR. Prior Drug Phone reflects that beginning on November 19, 2023, the day Target Cell Phone 4 was activated, phone activity reflects only incoming calls. The OXLEY SR. Prior Drug Phone was deactivated on December 10, 2023.

f. An analysis of telephone records for Target Cell Phone 4 from November 15, 2023 through December 20, 2023, approximately the first month Target Telephone 4 became active, revealed that Target Cell Phone 4 was in contact with a total of 11 phones. Out of those 11 phones, 8 phones (73%) also were in contact with OXLEY SR. Prior Drug Phone. Based on the foregoing, I believe that OXLEY SR. used Target Cell Phone 4 as a replacement phone for OXLEY SR. Prior Drug Phone.

g. On May 10, 2024, the Honorable Stephen C. Dries, United States Magistrate Judge, Eastern District of Wisconsin, signed a warrant authorizing the collection of data pertaining to the location of **Target Cell Phones 2**, 4, 5, **6**, **7**, and 8. During this period of interception, data pertaining to the locations of **Target Cell Phone 2** and Target Cell Phone 4 revealed they traveled together, which confirmed OXLEY SR. used both phones.

h. On May 17, 2024, at approximately 11:20 a.m., outgoing activity on Target Cell Phone 4 stopped. The court-authorized location data for Target Cell Phone 4 also stopped on May 17, 2024, at approximately 11:18 a.m., leading case agents to believe OXLEY SR. terminated the use of Target Cell Phone 4 (now OXLEY SR. Prior Drug Phone 2).

i. Case agents conducted telephone toll analysis and discovered that on May 17, 2024, at approximately 11:55 a.m., Michelle CARTER, using Target Telephone 8 began to be in contact with (619) 439-3393. Case agents conducted telephone toll analysis on (619) 439-3393 and discovered that outgoing activity on this phone began on May 17, 2024 at approximately 11:44 a.m. In addition, from May 17, 2024 through June 4, 2024, (619) 439-3393 was in contact with 18 telephone numbers. Of these 18 numbers, 9 numbers (50%) were also in contact with Target Cell Phone 4. Lastly, results of an administrative subpoena revealed (619) 439-3393 was subscribed to "Jessie Jackson" with an e-mail address of "lllwganggang@iCcloud.com, the same e-mail address assigned to Target Cell Phone 4. This led case agents to believe OXLEY SR. began using (619) 439-3393.

j. CARTER's cellular telephone revealed that phone number (619) 439-3393, contacted CARTER on June 4, 2024, at approximately 12:08 p.m. (PST). Additionally, while reviewing CARTER's cellular telephone number, (619) 439-3393 contacted CARTER on June 5, 2024 (PST), at approximately 12:49 a.m. (2 times), 12:50 a.m., 12:51 a.m. (2 times), 12:54 a.m., 1:04 a.m., 1:08 a.m., 1:16 a.m., 1:22 a.m., 1:41 a.m., and at 1:44 a.m.. Case agents believe OXLEY SR. was trying to get in contact with CARTER because she was attempting to transport the 10 kilograms of cocaine for OXLEY SR.

k. Case agents conducted telephone toll analysis and observed that the final outgoing activity on (619) 439-3393, was on June 8, 2024, at approximately 7:00 p.m., leading case agents to believe OXLEY SR. terminated the use of this telephone due to the cocaine seizure.

l. Additional telephone toll analysis revealed several of the phone numbers that where previously in contact with (619) 439-3393 (now OXLEY SR. Prior Drug Phone 3), were now in contact with (414) 813-3639 (**Target Cell Phone 9**), including CARTER and WILKS. The first outgoing activity on **Target Cell Phone 9** began on June 8, 2024, at approximately 6:54 p.m., minutes before the use of OXLEY SR. Prior Drug Phone ended, leading case agents to believe OXLEY SR. was now using **Target Cell Phone 9**.

m. An analysis of telephone records for **Target Cell Phone 9** from June 8, 2024 to June 12, 2024, revealed that **Target Cell Phone 9** was in contact with a total of 13 phones. Out of those 13 phone numbers, 4

phone numbers (30%) also were in contact with OXLEY SR. Prior Drug Phone 3. The analysis also showed a total number of 53 calls and text messages over **Target Cell Phone 9** during the time period analyzed. Out of those 53 calls and text messages placed to and from **Target Cell Phone 9**, 21 calls and text messages (39%) were with phone numbers that were also in contact with OXLEY SR. Prior Drug Phone 3.

n. Based on the foregoing, I believe that OXLEY SR. is using **Target Cell Phone 9** from as a replacement phone for OXLEY SR. Prior Drug Phone 3.

66. A subpoena was served to Verizon for subscriber information and tolls regarding **Target Cell Phone 10**. Verizon provided case agents with tolls, however directed case agents to contact Tracfone for subscriber information. Case agents served a subpoena to Tracfone for this subscriber information, but have not yet received the results.

## CONCLUSION

67. Case agents believe the location data requested will continue to assist in conducting targeted physical surveillance and identifying the OXLEY SR. DTO's source(s) of supply, stash locations, and other locations and individuals associated with the nature and scope of the DTO's drug trafficking activities.

68. Case agents searched law enforcement databases to confirm that **Target Cell Phones 2**, and **6** are currently being serviced by T-Mobile, that **Target Cell Phone 9** is currently being serviced by AT&T, and that **Target Cell Phones 7** and **10** are currently being serviced by Verizon Wireless.

69. Case agents are requesting this warrant authorizing the initial collection of data related to the **Target Cell Phones** for 30 days to further investigate the OXLEY SR. DTO's illegal activities and to identify locations to which DTO members are traveling to further his drug distribution trafficking activities.

70. Based upon my training and experience, I know that individuals involved in drug trafficking use their cellular telephones to contact other drug dealers and drug purchasers, and that information relating to their telephones may show the areas in which they are trafficking drugs and the individuals who they are contacting to sell or distribute the drugs. Based upon the facts in this affidavit, there is probable cause to believe that OXLEY SR. and others are engaged in the trafficking and distribution of controlled substances and are using the **Target Cell Phones** while engaged in these crimes. I further submit that probable cause exists to believe that obtaining the location information of the **Target Cell Phones** will continue to assist case agents in determining the OXLEY SR. DTO's criminal activities, to include meeting locations, co-conspirators, and sources of supply.

71. In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the

"cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

**Cell-Site Data**

72. Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about the **Target Cell Phones**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

73. I further know that some service providers can collect timing advance or engineering data commonly referred to as per call measurement data (PCMD), RTT,

True Call, Advance Timing, or equivalent. Per-call measurement data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

**E-911 Phase II / GPS Location Data**

74. I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the **Target Cell Phone**s, including by initiating a signal to determine the location of the **Target Cell Phones** on

the Service Provider's network or with such other reference points as may be reasonably available.

75. I know that AT&T Corporation can provide historical precision GPS location information, historical handset location data, and handset triangulation data, also known as Network Event Location System (NELOS) data. NELOS data may provide location data based upon the handset itself. Furthermore, I know that T-Mobile can use its precision location tool with cellular devices, also known as WebMap.

## Subscriber Information

76. Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **Target Cell Phones'** user or users and may assist in the identification of co-conspirators and/or victims.

<u>**AUTHORIZATION REQUEST**</u>

77. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

78. I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

79. I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the **Target Cell Phones** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

80. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until **180 days** after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **Target Cell Phones** would seriously

jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

81. Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I therefore request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **Target Cell Phones** outside of daytime hours.

## ATTACHMENT A-1

**Property to Be Searched**

1. Records and information associated with the cellular devices assigned the following call numbers:

   a. (310) 760-1161 (Target Cell Phone 2); and

   b. (323) 812-2879 (Target Cell Phone 6);

Target Cell Phones 2 and 6 are in the custody or control of T-Mobile US, Inc., (referred to herein and in Attachment B as the "Service Provider" or "Provider"), a wireless communications service provider that is headquartered at 4 Sylvan Way, Parsippany, New Jersey

2. Target Cell Phones 2 and 6.

# ATTACHMENT A-2

## Property to Be Searched

1. Records and information associated with the cellular device assigned the call number (414) 813-3693 (Target Cell Phone 9). Target Cell Phone 9 is in the custody or control of AT&T Corporation (referred to herein and in Attachment B as the "Service Provider" or "Provider") a wireless telephone service provider headquartered at 11760 U.S. Highway 1, North Palm Beach, Florida.

2. Target Cell Phone 9.

## ATTACHMENT A-3

**Property to Be Searched**

1. Records and information associated with the cellular devices assigned the following call numbers:

   a. (323) 675-7829 (Target Cell Phone 7); and

   b. (669) 322-6506 (Target Cell Phone 10).

Target Cell Phones 7 and 10 are in the custody or control of Verizon Wireless, (referred to herein and in Attachment B as the "Service Provider" or "Provider"), a wireless communications service provider that is headquartered at 180 Washington Valley Road, Bedminster, New Jersey.

2. Target Cell Phones 7 and 10.

## ATTACHMENT B

**Particular Things to be Seized**

**I. Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phones for the time period March 1, 2023, to the present:

i. Names (including subscriber names, usernames, and screen names);

ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii. Local and long-distance telephone connection records;

iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v. Length of service (including start date) and types of service utilized;

vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity

Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phones for the time period March 1, 2023, to the present including:

a. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

b. Information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

b. Information associated with each communication to and from the Target Cell Phones for a period of **30** days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e., antenna towers covering specific geographic areas) and sectors (i.e., faces of the towers) to which the Target Cell Phones will connect at the beginning and end of each communication, as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

c. Information about the location of the Target Cell Phones for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, WebMap data, NELOS data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the Target Cell Phones on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846, involving Marcel OXLEY SR., Cornel C. CARNEGIE, Stephen REESE, and Kristin CENDEJAS.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, ________________________________, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by ____________________, and my title is ____________________________. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of ____________________. The attached records consist of _________________________.

I further state that:

a. All records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of ____________________ and they were made by ____________________ as a regular practice; and

b. Such records were generated by ____________________ 's electronic process or system that produces an accurate result, to wit:

1. The records were copied from electronic device(s), storage medium(s), or file(s) in the custody of ____________________ in a manner to ensure that they are true duplicates of the original records; and

2. The process or system is regularly verified by ______________________ and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____________________________ ______________________________________________
Date Signature